(No. 13177.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN BACON, Plaintiff in Error.

*Opinion filed April 21, 1920—Rehearing denied June 3, 1920.*

1. CRIMINAL LAW—*what is necessary to acquittal on ground of insanity.* In order to entitle the accused to an acquittal on the ground of insanity the legal presumption of sanity must be overcome by evidence tending to prove insanity which is sufficient to raise a reasonable doubt of his sanity at the time of the commission of the crime.

2. SAME—*when Supreme Court will not interfere with verdict of jury.* It is the special province of the jury to determine whether the circumstances of the case are such as to raise a reasonable doubt of the defendant's guilt, and the Supreme Court will not, on the evidence, interfere with a verdict of guilty unless, after a careful consideration of the whole testimony, there is clearly a reasonable and well-founded doubt of the guilt of the accused.

3. SAME—*when discharging deadly weapon is an unlawful act.* Unnecessarily flourishing and discharging a deadly weapon in a public place in close proximity to other people is an unlawful act.

4. SAME—*when the People are entitled to instructions defining manslaughter in murder trial.* Where a defendant is indicted for murder and there is evidence in the record by which the jury might reduce the crime to manslaughter, the People have a right to have manslaughter defined in instructions and to have a form of verdict submitted on that theory of the case.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. MARCUS KAVANAGH, Judge, presiding.

CHARLES V. BARRETT, and JOHN F. TYRRELL, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, NOAH C. BAINUM, and WILLIAM C. CLAUSEN, (EDWARD E. WILSON, and JAMES C. O'BRIEN, of counsel,) for the People.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

Plaintiff in error, John Bacon, was tried in the criminal court of Cook county on an indictment charging him with the murder of Jeremiah McDonald. He was found guilty of manslaughter, and seeks to reverse the judgment of the criminal court for the reason that the evidence raised a reasonable doubt of his sanity and therefore that the verdict is not supported by the evidence, and for the further reason that the court erred in giving to the jury instructions defining manslaughter.

The shooting took place in Welch Bros.' saloon, in Chicago, about 11:45 o'clock in the night of January 18, 1918. Plaintiff in error was at the time watchman for the South Side State Bank. He was an old acquaintance of deceased, who was a teaming contractor. Early in the evening of the day of the shooting plaintiff in error and deceased met

in Welch Bros.' saloon and the evening was spent visiting and drinking. According to the testimony of the bartenders the men seemed to be on friendly terms and the conversation seemed to be the ordinary conversation of acquaintances. They testified that the men drank moderately throughout the evening and that at the time of the shooting they were not drunk. About 11:45 o'clock, without warning and apparently without provocation, Bacon drew his revolver from his pocket and fired two shots at random. The first shot went into the ceiling of the bar-room and the second shot struck the deceased in the head. Deceased reeled and ran down to the basement. One of the bartenders grappled with plaintiff in error and tried to take the gun from him. While the bartender was struggling with plaintiff in error he said, "I will shoot you, too." When the bartender inquired, "Why would you do that?" he replied, "I guess that's right; you have been my friend." When the other bartender came to the assistance of the one holding plaintiff in error, plaintiff in error said, "I will shoot that fellow, too." Two officers responded to a call for police and took plaintiff in error in custody. The employees at the saloon and the police officers testified that plaintiff in error "acted crazy." The next morning one of the officers talked with plaintiff in error in the police station, and plaintiff in error told him that he did not remember anything that had taken place the night previous, and that he did not remember shooting deceased and could not believe that he had shot him, because they had always been good friends. Deceased was taken to the hospital and died February 9, 1918, from the effects of the gunshot wound.

Plaintiff in error testified that he was born in 1861 in Washington, D. C., and that he came to Chicago in 1879; that he had been a member of the police department of the city of Chicago for over twenty-five years and that he was retired on a pension in October, 1915; that while he lived in Washington he received two bullet wounds in his head,

as a result of which he was in the hospital for two months, during which time the bullets were taken out; that in the summer following this accident, while attending a picnic, he fell in a faint and did not fully recover for more than a week; that one time while at drill on the police force in Chicago he fainted and remained unconscious for several hours; that at another time while he lived in Chicago he fainted at his home and did not recover for five or six days; that at times since his accident in Washington his tongue becomes stiff and he has pains in the left side of his head; that in recent years he has been troubled with a ringing sound in his ears, causing him difficulty in hearing and giving him pains in his head; that he had known McDonald for more than twenty-five years; that he knew his parents; that he had always been friendly with all of the family; that he had never quarreled with McDonald and that they met frequently; that on the day of the shooting he left his duties as special policeman for the South Side State Bank about the middle of the afternoon and went to the circuit court room to appear as a witness; that about five o'clock he went to the office of the chief of police to get a permit as special policeman and on his way home from there he stopped in Welch Bros.' saloon; that he met McDonald in the vestibule of the saloon and was invited by him to have a drink; that they split a bottle of beer between them, and that McDonald went away for a little while, saying that he would soon return; that he read the newspaper while he waited for McDonald; that when McDonald came back they went into the restaurant, where they were served with some sandwiches and a couple of bottles of beer, which they drank while they ate their sandwiches; that they sat in the restaurant for probably an hour and a half, talking, during which time they drank five or six bottles of beer; that they walked into the bar-room and stepped up to the bar, where plaintiff in error paid for the sandwiches; that he has no recollection of anything

happening from the time he paid for the sandwiches until the following morning, when officer Jacobson came to the cell in the police station and spoke to him; that the first he knew of the shooting was when officer Jacobson told him that he shot Jerry McDonald the night before; that he said to the officer, "You are crazy; I did not shoot him; he was one of the best friends I had in the world; I would not hurt a hair on his head." According to the testimony he remembers nothing about the shooting, nothing about the police officers arresting him and nothing about riding to the station in the patrol wagon. He states emphatically that he does not remember anything that occurred between the time he paid for the sandwiches and the time he talked with officer Jacobson, about eight o'clock the following morning. He says that during the evening he drank two drinks of whisky and not exceeding five bottles of beer, and that he was not intoxicated.

Dr. William O. Krohn was the only witness besides plaintiff in error who testified for the defense. He testified that he was a physician and surgeon and that he had made a special study of nervous and mental diseases; that he had been medical superintendent of the State Hospital for the Insane at West Massachusetts and of the State Hospital for the Insane at Kankakee, Illinois; that he had examined and cared for upwards of 20,000 cases of nervous and mental diseases, and that he had lately been attached to the medical corps of the United States army, treating returned soldiers suffering from shell shock; that plaintiff in error came to his office on two different occasions and requested an examination as to his physical, mental and nervous condition; that he made the examination March 12, 1918; that he found a wound on the head of plaintiff in error which caused the bone of the skull to press on the brain in such a manner as to cause unconsciousness and mental derangement at certain times; that this wound, and another further back on his head, have caused certain changes

to take place in the blood vessels that supply the brain, in a manner to cause periodical unconsciousness and insanity; that he found his blood pressure to be 208, whereas the normal pressure was 150 or 160; that he found a marked wastage of the tissues of the left hemisphere of the brain, and found that there was an insufficient blood supply to the brain, due to defective circulation caused by hardening of the arteries, or what is known as arteriosclerosis; that an insufficient supply of blood causes softening of the brain, and that incipient paresis had set in; that his examination revealed that plaintiff in error might at any time have intervals of unconsciousness, and that at these times he would not be responsible for his acts and know nothing of what he might say or do. In answer to a hypothetical question which assumed the life history of plaintiff in error as related by himself, the physical condition as found by the examination and the circumstances surrounding the shooting, the doctor expressed the opinion that at the time the shooting took place the defendant was not able to know right from wrong, that he was not in the possession of his right senses and that he was insane. The doctor expressed the further opinion that plaintiff in error was not insane at the time of the trial.

It is earnestly contended by counsel for plaintiff in error that a fair consideration of the above and foregoing evidence cannot fail to raise a reasonable doubt of the sanity of the accused. It is not contended that the jury were not fully and properly instructed regarding the law relating to insanity. While the instructions have not been abstracted, we have examined the record and find that the jury were fully instructed regarding their duty to acquit the accused if they entertained a reasonable doubt of his guilt. It has long been the law in this State that every man is presumed to be sane until the contrary is shown. In order to entitle the accused to an acquittal on the ground of insanity this legal presumption must be overcome by evidence tending

to prove insanity which is sufficient to raise a reasonable doubt of the sanity of the accused at the time of the commission of the act for which he is sought to be held accountable. (*Dacey* v. *People,* 116 Ill. 555; *Jamison* v. *People,* 145 id. 357; *People* v. *Casey,* 231 id. 261.) If the statement of plaintiff in error to the effect that he was wholly unconscious of what took place at the time of this shooting is true, then it is clear that he was not then accountable for his acts and should have been acquitted. On the other hand, we are not prepared to say that there is no evidence in the record which justified the jury and the trial judge in disbelieving this testimony of plaintiff in error. It is undisputed that immediately after he shot deceased he said to the bartender who was grappling with him, "I will shoot you, too," and that he said concerning the other bartender when he came to help his partner, "I will shoot that fellow, too." The addition to both these statements of the adverb "too" indicates that he knew he had already shot one party. It is also significant that when the bartender inquired of him why he wanted to shoot him, he replied, "I guess that's right; you have been my friend."

While the circumstances surrounding this shooting are strange and while it is difficult to account for the conduct of plaintiff in error, it is clear that there was in the record undisputed evidence which justified the verdict of the jury. In a long line of cases this court has said that the most important and useful function which a jury is required to perform is to determine on which side of a controversy the real truth lies where the testimony as to the material facts is directly in conflict and irreconcilable. This court will not interfere with a verdict of guilty except when this court is able to say, from a careful consideration of the whole testimony, that there is clearly a reasonable and well-founded doubt of the guilt of the accused. It was never the intention of the law that the court should usurp the province of the jury. It is the special province of the jury

to determine whether the circumstances of the case are such as to raise a reasonable doubt of the defendant's guilt. *Gainey* v. *People,* 97 Ill. 270; *People* v. *Hubert,* 251 id. 514; *People* v. *Schoop,* 288 id. 44; *People* v. *Dare,* 288 id. 182; *People* v. *Foster,* 288 id. 371; *People* v. *Binger,* 289 id. 582; *People* v. *Laures,* 289 id. 490.

Plaintiff in error further contends that the trial court erred in giving to the jury instructions defining manslaughter. He contends that the holding of this court in *People* v. *Schultz,* 267 Ill. 147, is controlling here. We think the cases are clearly distinguishable. In that case there was no evidence whatever justifying an instruction on manslaughter. In this case plaintiff in error was committing an unlawful act by carrying a revolver when he was not engaged in the discharge of his official duties, (Hurd's Stat. 1917, pp. 958, 960,) and the killing of deceased was the direct result of the unlawful act of flourishing and discharging a deadly weapon. In *People* v. *Venckus,* 278 Ill. 124, we held that intentionally firing a revolver in a public place in close proximity to other people is an unlawful act. Where there is evidence in the record by which the jury might, as they did here, reduce the crime from murder to manslaughter, the People have a right to have manslaughter defined and to have a form of verdict submitted on that theory of the case. *People* v. *Doras,* 290 Ill. 188.

There is no complaint of the conduct of the State's attorney, the jury or the court. From our examination of the record we feel that plaintiff in error has had a fair and impartial trial, and we are not able to say that the evidence did not justify the verdict of the jury.

The judgment of the criminal court of Cook county is affirmed.                                        *Judgment affirmed.*