(No. 19479.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM HENRY HAUKE, Plaintiff in Error.

*Opinion filed June 19, 1929.*

JOHN V. CLINNIN, CECIL SMITH, STANLEY M. DOYLE, WALTER QUIGLEY, CYRIL L. WESTON, and EMMETT BYRNE, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and JOEL C. FITCH, (EDWARD E. WILSON, and JOHN HOLMAN, of counsel,) for the People.

Mr. JUSTICE STONE delivered the opinion of the court:

Plaintiff in error was convicted in the criminal court of Cook county of the murder of Isabella Scheckley and was sentenced to death. The deceased resided with her son, Louis, in the city of Chicago, at 1405 West Marquette road. On May 28, 1925, plaintiff in error came to her house, shot her twice through the head, killing her almost instantly, and shot her son, Louis, three times, though his wounds were not serious. There is no dispute as to these facts, but plaintiff in error's defense was that he shot at Louis Scheckley, who was about to shoot him; that his shooting was in self-defense, and that Mrs. Scheckley rushed in between plaintiff in error and her son, Louis, and was killed by accident or misadventure. These three persons were the only ones present at the time of the shooting.

It appears that plaintiff in error had been separated from his wife for some months and between the latter part of March and the first of May she had lived in the Scheckley home with her child, a son. The undisputed evidence shows that on the morning of the homicide, plaintiff in error, who at that time was living in Harvey, was driven to the home of the deceased by one DiFalco, with whom he had made

such arrangements the night before. On the evening·before the homicide plaintiff in error traded his gun, an army pistol, to one Fouts, of Harvey, receiving in return the gun which was introduced in evidence in this case. About seven o'clock on the morning of the homicide plaintiff in error appeared at the rear door of the home of Elizabeth Finnegan, who lived in the first house west of the home of deceased and but a few feet therefrom. She testified that when she first saw him he was trying to get in at her back door, but the door was locked; that she went to the door, and he was standing there with one hand on his hip, and said, "I want to talk to Mrs. Scheckley." Witness replied, "Mrs. Scheckley don't live here." He said, "Where does she live?" Witness said, "Next door." He then went down her back steps and jumped over the fence between her house and Mrs. Scheckley's house. This witness testified that shortly thereafter she heard shots, and in a few minutes Louis Scheckley came to her house, dripping with blood, and asked her to call the police. She stated that at the time she saw plaintiff in error he appeared to be nervous and upset, and that she did not see him after he went down her back steps and jumped over the fence into the Scheckley yard.

Louis Scheckley testified that on the morning of the homicide he was awakened about a quarter to eight by a scream and there were sounds like shots; that he jumped out of bed and went to the door of his room, which was directly off the dining room, and that as he appeared in the doorway he was shot; that when he first opened the door he saw a gun but did not see who had it; that he later saw plaintiff in error there; that he had a shiny gun; that he was struck in the head and in the arm by the bullets from this gun; that he saw his mother lying on the floor just north of the sewing machine, which was in the corner of the kitchen; that her body was partly in the kitchen and partly in a short hallway which extended north to the din-

ing room; that after he was shot he fell into the dining room, which was the next room east of his room, and plaintiff in error rushed through the dining room, kicked him and went into the front room of the house, which had been occupied by Mrs. Hauke and child during the time that she had stayed at the Scheckley home. Witness testified that he jumped through the window of his own bed-room and went to Mrs. Finnegan's home, next door, and asked her to call the police. On cross-examination he testified that he had known Mrs. Hauke about eighteen years; that she had lived in their home between three and four weeks but that she left about the first of May. He testified that before Mrs. Hauke was married he accompanied her to places once or twice but that he had never been in her company from the time she was married; that he didn't know why Hauke came to his house that day, and that the other time he had come he came to see his wife. He was asked if he had told Hauke to stay away from the house while Mrs. Hauke was there, and he said that he did not, and that he did not threaten him or say that if he, Hauke, did not stay away from the house he would send him back to Harvey in a box. He testified that he did not have a gun in his possession or in the house at the time of the shooting and did not attempt to shoot Hauke.

By the witnesses John Gordon and Fern Heckman, two children living in the neighborhood, it was shown that a pistol introduced in evidence was found on the lawn of the Heckman home, which is two doors west of the home of the deceased. Mrs. Heckman identified the pistol introduced in evidence as the one which she gave to the police, and gave as the reason for her identification of it that she had copied the numbers from the inside of the gun on a paper before turning it over to the police. This gun is shown to have had five discharged shells in it when found.

As we have indicated, the disputed evidence relates to what took place in the house. Plaintiff in error's defense

was that Louis Scheckley attempted to shoot him and that he shot in self-defense, accidentally killing the deceased. A police officer, Louis J. Starr, testified that he was called to the home of the deceased on the morning of the homicide and that he found the deceased lying on her back in a short hallway between the dining room and kitchen; that he found two holes in the left side of her head; that she was bleeding and unconscious.

Dr. Henry G. W. Reinhardt, the coroner's physician, testified that the body showed three puncture wounds, such as made by a bullet, two in the left cheek and another in the right side of the head. One bullet was found in the head on post-mortem examination. He was of the opinion that the hole on the right side of the head might have been caused by the exit of one of the bullets that entered on the left side.

Police officer Patrick McDonough testified that he was called to the house of deceased on the morning of the homicide and found her lying on her back on the floor and took her to the St. Bernard's Hospital. On cross-examination he stated that he had a talk with Louis Scheckley and asked him how it happened and that Scheckley told him who did the shooting; that Scheckley told him that plaintiff in error did the shooting.

Police officer Edward Tyrrell testified that in the year 1928 he was sent to Fairville, California, to return plaintiff in error, who had been arrested there; that during the return trip to Chicago plaintiff in error told him how he happened to go over to the home of the deceased on the morning of the homicide; that he said he went there with a fellow from Harvey; that he was looking for his wife; that he went to the back door of the basement and went up the steps and started shooting; that he didn't say how many shots he fired. He also stated that he knew he shot the son but did not know he had shot the woman—the mother. He testified that plaintiff in error was at a marine

hospital at Mare Island at the time he was arrested. On cross-examination he stated that Hauke had told him that he didn't know that anyone was dead until he was arrested; that Hauke told him he came up the basement steps and went through the basement door; that at the time of the shooting, deceased and the son were there together; that he had climbed up the steps and started shooting; that he didn't know where he was shooting but that he knew he had shot the son; that he did not know that he had shot the woman. This witness also testified that Hauke told him that his wife was staying there with the Scheckleys; that Scheckley and his wife had been sweethearts; that his wife intended to marry Scheckley as soon as she could get rid of him; that he wanted his wife to come back and live with him; that when he called up to talk with her the Scheckleys would not call her to the telephone; that on the morning of May 28, when he went to the Scheckley home, he asked for his wife, and Mrs. Scheckley said: "You stay out of here; you cannot see her; she has got a better man now."

Officer John W. Norton testified that on the evening of the day of the homicide he went to Harvey and found DiFalco, who had taken Hauke to the home of the deceased, and Fouts, who had loaned him the revolver; that he got from Fouts the army pistol which Fouts said Hauke had left with him; that on June 11, 1928, after the arrest of Hauke, this witness was present when a written statement was taken from Hauke after he had been returned from California, and that Hauke was told, before the statement was made, what his constitutional rights are. He testified that there were five carbon copies made at one time on the typewriter. He identified one of the carbon copies of the statement which was offered in evidence. Counsel for Hauke objected to its admission in evidence because it was not shown that the original could not be found. The witness stated that they had looked for the original but had

not found it though they made a diligent effort, but that they could find it, later stating that he meant maybe they could find it but that they had looked for it diligently and were unable to get it. This statement was admitted in evidence, and this ruling is assigned as error.

The statement made by Hauke was in substance as follows: He was at the time of the trial thirty-one years of age. He was married October 4, 1923, has one child, a boy, born August 24, 1924. His wife left him in March, 1925. On the morning of May 27, 1925, he went from his mother's house in Harvey, where he was staying, to a drug store and called Mrs. Scheckley and told her he would like to talk to his wife, and that she told him to go to hell, and hung up; that he then went back to a pool-room in the neighborhood of his home and stayed around there all day until dark; that some time in the afternoon he again called the Scheckley house by telephone and Mrs. Scheckley answered; that he asked if he could speak to his wife; that she did not say anything at first, and then said, "No, she is not going to speak to you," and told him not to call her up any more, and hung up; that he went back to the pool-room and had a few drinks of moonshine, and about eight or nine o'clock that night he and the pool-room owner went to Chicago Heights, where they had a couple of glasses of beer and returned to the pool-room in Harvey about midnight. His statement further was, that on the evening of May 27 he made up his mind that he was going to Mrs. Scheckley's house to see his wife the next morning; that the young man who had driven him over to Chicago Heights promised to drive him to Chicago; that the two slept in the pool-room that night and started for the Scheckley house about six o'clock in the morning of the 28th, arriving there about seven o'clock; that he got out of the machine in front of the house and knocked at the front door, but no one answered; that he told the young man he was going around back and for him to drive around

in the alley in the back, which he did, stopping back of the Scheckley home in the alley, with his machine facing west, and that he, Hauke, went to the back door of the basement and knocked. The statement further is that Mrs. Scheckley came to the door and he asked to see his wife, and Mrs. Scheckley said, "Your wife don't want to see you; get the hell out of here," and that he said to Mrs. Scheckley, "I want to see her and I am going to see her," and that Mrs. Scheckley said, "Your wife is going to get a divorce and marry a real man," to which he replied, "I want to see her," and Mrs. Scheckley said, "You are not going to see her," and shoved him toward the door, and that she called her son, Lou, twice and then ran towards the stairs leading up-stairs from the basement door; that Louis Scheckley opened the door leading from the up-stairs to the basement and that plaintiff in error started shooting; that he shot four or five times. The statement further is that he knew that he shot Louis Scheckley but he didn't know whether he shot Mrs. Scheckley or not; that the revolver he used was a 38-calibre nickel-plated gun; that he got it from Frank Fouts and left his revolver in the pool-room, and that his revolver was a .44 army revolver. The statement also sets out that he looked about to find his wife and did not see her and ran out the back door and got into the car with the young man who drove him up; that they drove west in the alley to the first street and then turned south; that just before they turned south he threw away his revolver and told the young man to drive him to Seventy-second street and the Illinois Central railroad tracks. The statement thereafter details his travels from Hammond, Indiana, to Cincinnati, Norfolk, Virginia, then to Freeport, Texas, Oklahoma City, Fargo, North Dakota, and other places where he was employed in different capacities before he was arrested in 1928.

Joseph DiFalco testified that at Harvey, the night before the homicide, he met Hauke, who told him that he

wanted to be taken to his wife's house to get some clothes; that the next morning he took him down to Sixty-seventh and Marquette road; that Hauke told him to wait for him; that he waited for him in the alley; that when Hauke came out of the house he had a gun in his hand and got on the running-board of the car and told him to drive west; that when they got to the first street they turned south, and after driving two or three blocks Hauke got off and took $1.50 from him; that he didn't see him any more and that Hauke did not tell him about having a fight with anybody. He testified that Hauke was not drunk, and that while Hauke was in the house he heard noises but could not swear that they were shots. Frank Fouts testified to the exchange of guns. He stated that Hauke told him he had a job as watchman and wanted to exchange guns with him.

For the defense Caroline Alfrank testified that she is Hauke's sister, and that she called up Mrs. Scheckley and asked to talk to Mrs. Hauke, but was told by Mrs. Scheckley that she was not there and that she did not know when she would be back, and that, furthermore, he, Hauke, should not call her or have anything to do with her. She testified that Hauke's reputation prior to the homicide was good.

William Smith testified that he lived in Harvey, and that Hauke's reputation as a peaceful and law-abiding citizen in that community was good as far as he knew. Such, also, was the testimony of one Herman Jensen.

Plaintiff in error took the stand and testified that he was thirty-one years of age and was born in Harvey, Illinois; that he served in the World War with the Canadian forces, with whom he enlisted in October, 1916, at Nova Scotia, and went to France in the latter part of November. He was asked if he received any wounds in France, and on objection the court stated it was not proper examination unless the defense was that he had received wounds that affected his mental condition. He testified that he returned

to Canada in 1918; that he was discharged as medically unfit and went to New York and then to Chicago, and later, in 1919, returned to New York and entered the merchant marines; that he had been in that service before; that he had enlisted from that service into the Canadian army; that after he was discharged he went to the Pacific coast, to San Francisco and to Japan; that he then went to Vladivostock, Siberia; that he enlisted in the Foreign Legion of Kerensky's army, fighting Bolshevists from June until the latter part of 1919; that he was taken prisoner by the Bolshevists and was in captivity from June until November; that after he left the Russian army he went to Constantinople and then to the United States, and that he was married in October, 1923. He testified that he treated his wife all right but she left him in March, 1925, and went to the Scheckleys; that he went out to that place first a number of times in April to see her and their child; that Mrs. Scheckley told him, while he was there, that her son was going to marry his wife; that she was going to get a divorce from him and their baby would be christened after Mrs. Scheckley's son; that once while he was there he saw Scheckley and his wife walk out of the bed-room together, and he asked her what she meant by being in a bed-room with him, and Scheckley sneered, and that he left, and that when he went to the door Scheckley came and ordered him out of the neighborhood and told him to stay out, telling him that if he stayed around the neighborhood or came near his home he would send him back to Harvey in a box, and that he did not come back until May 28. He testified that on the 27th he called up Mrs. Scheckley and wanted to talk to his wife, and that Mrs. Scheckley told him that she didn't want to talk to him and not to bother calling up. He stated that he had no intention of using the gun when he got it from Fouts, and that he told DiFalco to drive him to Chicago because he wanted to see his wife and baby and get his clothes. He testified that when he went to the

Scheckley house he had no intention of hurting anybody; that he rapped on the back door of the basement, and Mrs. Scheckley came to the door and that he went in. He states: "She asked me what I wanted. I said, 'I came to see my wife and baby.' She said, 'You cannot see your wife or baby, and she has got a real man now and is going to get a divorce from you and marry my son.'" He testified that with this she started up the basement stairs and called "Lou" about three times, and that Louis partly opened the door at the head of the basement stairs and said, "I have got you now where I want you," and raised his hand and fired; that he had a gun in his hand; that he did not know what kind of revolver it was but it was blue, and when he was doing that the witness also fired; that at the time the witness fired Mrs. Scheckley was between the two men, about a foot away from her son, going up-stairs, and that when witness fired she stepped into the way; that he did not know she was dead until he was arrested, in 1928; that he came on up-stairs and Scheckley staggered through the doorway leading to the dining room and witness hit him in the face with his fist; that the reason he hit him was that he still had a gun in his hand; that the gun fell out of Scheckley's hand when he hit him, and witness went on through to the front bed-room to see if his wife was there but did not see her, and came out through the back of the house and left. He testified that he threw his gun away just before they turned into the first street west of the house. He testified that he did not draw his gun until after he saw Louis Scheckley raise his gun.

On rebuttal, police officer Norton was recalled and testified that he had had a conversation with the witness Smith, who had testified that defendant bore a good reputation in Harvey, and that Smith told him that defendant had a bad reputation in Harvey.

Numerous objections are raised on the record. It is objected, first, that the court erred in not granting a con-

tinuance and that plaintiff in error was forced into trial without opportunity for preparation.

Hauke was arrested in June, 1928. On the 27th of that month his case was first called for trial and continued until July 3. Prior to July 3 counsel who tried the case for him had been appointed. The case was continued from July 3 until September 12. On that day defendant's counsel sought a continuance on the ground that he had a criminal case on trial in another branch of the criminal court. The court, apparently learning that the case in the other branch would take but a short time, granted time for disposition of it. David I. Baim, Hauke's counsel, asked for a continuance of the case on the ground, also, that he did not have an opportunity to prepare; that he had not prepared the instructions but that he had a lawyer who was preparing them, and that Saturday was a Jewish holiday and that he had never worked on that day. Present counsel for plaintiff in error say that the lawyer appointed to defend Hauke was a young, inexperienced, inefficient attorney who had no facilities, means or time to investigate and prepare the defense and that he had but three conferences with plaintiff in error. These grounds for continuance are not shown by the record. Two months were given in which to prepare for trial. While counsel argue that there were but three conferences between Hauke and his attorney, yet the facts in the case are very simple, and no reason appears why all of the necessary facts and names of witnesses could not be learned in one conference. It is also argued that he was not prepared as to the law. The record shows that twenty-nine instructions were given, fourteen of which were given for the defendant, and that they fully cover the points of law involved in the case. There were also twelve instructions offered on behalf of plaintiff in error which were refused by the court. It is also argued that the fact that the State's attorney, in a colloquy before the court concerning a continuance, had stated that there

was a clamor for trial, and the fact that the judge had said that the Press was critical of delays, are to be taken as evidence that the trial was unduly hurried. Notwithstanding comments of counsel or the court, it is clear from the fact that a period of two months was given for the preparation of this case, which, as we have said, is in nowise complicated on the law or facts, that the trial was not unduly hurried. In the interest of but ordinary expedition this case should have been tried within that time. It is not shown that the defendant suffered in any way from the trial of the case at the time it was tried. All of the witnesses suggested by counsel for plaintiff in error were subpœnaed, attended court and testified. No absent witness was or has been suggested whose testimony might have been of assistance to the accused, and from the nature of the facts admitted on the trial it is evident that all who knew anything about the crime were present in court and testified. The court did not err in requiring that the case go to trial.

It is also objected that the court erred in admitting testimony in respect to the condition of the premises. A plat was made, identified and put in evidence showing the location of the rooms and stairs of the Scheckley home. Counsel argue that the plat was not correct, in that it shows a bend in the stairway from the basement to the kitchen, whereas the testimony shows that the stairway was straight. A mere cursory examination of the plat in evidence shows that it delineates the stairway from the basement to the living floor of the house as straight and without turn. The plat shows two stairs, separated by a door, one rising from the basement and the other rising from the living floor. There is no merit to this objection.

It is urged that the court would not permit plaintiff in error's counsel to show the relationship between Scheckley and the defendant's wife when she was living at the Scheckley home. Offers were made of conversations which were said to have occurred between Mrs. Scheckley and the wit-

ness. These statements were clearly hearsay evidence and incompetent and it would have been error to admit them. The facts of *People* v. *Selknes*, 309 Ill. 113, cited by plaintiff in error, are in nowise analogous to the facts of this case. While it was competent to show any relationship existing between Scheckley and Hauke's wife, such could not be done by hearsay testimony.

It is next objected that the testimony of John Gordon and Fern Heckman was received in evidence without an examination as to their qualification. These witnesses were both children. The evidence shows that at the time the Gordon boy testified he was nine years of age and at the time of the homicide he was six. The Heckman girl was apparently of about the same age. These witnesses testified to having found a pistol, which was turned over to the mother of the Heckman girl, by her turned over to the police and later introduced in evidence. There is no dispute about their testimony. Hauke testified that he threw away the gun with which the shooting was done, just as he turned from the alley at the rear of the Scheckley home onto the first street west. This would be in the neighborhood in which the pistol was found by the children. His description of the gun that he borrowed from Fouts corresponds with the pistol introduced in evidence. No question was raised as to the competency of these children, and counsel for Hauke, knowing what his testimony would be, doubtless saw no point in raising that question, and there was none.

It is also urged that it was error to permit the police officer Louis J. Starr to testify, over objection of counsel for plaintiff in error, concerning the holes found in the head of the deceased, because the witness had not been qualified as to his knowledge concerning such wounds. This objection is captious. It certainly requires no special knowledge to be able to tell whether there is a hole in the head

of a wounded person and whether that hole is on the right or left side.

It is also urged that it was error to permit the witness Elizabeth Finnegan to testify that Hauke, when he called at her house on the morning of the shooting, appeared to be nervous and upset. This was but a description of the appearance of plaintiff in error at that time and was not a conclusion. The evidence was competent.

It is also argued that it was error to permit the witness McDonough to testify that Scheckley told him by whom the shooting was done. While this was brought out on cross-examnation and it does not appear why the question was asked, it could have had no effect whatever on the defense of plaintiff in error, since he himself testified that he did the shooting.

It is also urged that it was error to permit the testimony of officer Norton that he heard that the defendant intended to kill his wife. This is not his testimony. Norton, on cross-examination, said that in talking to the defendant he told the defendant that he had heard he was going to kill his wife. It was not error to permit him to so testify.

It is also objected that the court erred in permitting the testimony of the witness Norton concerning the statement made by Hauke and the admission of that statement in evidence. The statement as shown by the witness Norton was a carbon copy of the original, made at the same time and by one impression of a typewriter. Under the law such carbon copy is an original and is competent as evidence. *People* v. *Chicago, Rock Island and Pacific Railway Co.* 329 Ill. 467.

It is argued that it was error to admit officer Tyrrell's testimony. He testified concerning a conversation with Hauke while returning from California. The argument is that the trial court should have required a hearing, out of the presence of the jury, as to Hauke's statement to officer Tyrrell, and as to his written statement, before admit-

ting them in evidence. No question as to the voluntary character of these statements was raised and the record shows none could have been. Hauke in his testimony at no time sought to repudiate statements he had made to the officers or to show that he had been influenced either by ill-treatment or promise to make such statement. His statement on the witness stand was for the most part the same as that detailed by Tyrrell. Evidence of those statements was competent.

It is objected that the court erred in not permitting plaintiff in error to testify to wounds received in military service. The court properly ruled that unless such wounds had something to do with the defense to the charge, that evidence of them was not material. There was no defense of lack of mental capacity or impairment from injury but the defense was that the killing occurred during the defendant's self-defense against the assault of Louis Scheckley.

It is also contended that the case should be reversed because Hauke was represented by inefficient counsel, who was negligent in the preparation and conduct of his case. We have carefully examined not only the abstract filed by present counsel for Hauke but likewise the transcript of evidence and find that this complaint is not substantiated. It is apparent from the facts of the case that three interviews with the defendant, if only three were had, would be sufficient to prepare the case. It is claimed that counsel who tried the case for Hauke did not understand the theory of defense or inspect the premises, and did not see the diagram of the premises until produced in the evidence. There is nothing in the record to indicate that these things are true. The theory on which the case was tried was, as we have stated, that of an accident to a bystander during the defense by Hauke of his life, by reason of the deceased rushing in between the two combatants. Counsel argue that an experienced attorney might have discovered that the plat used showed that the stairway was not straight,

whereas the facts as shown by the defendant showed the stairway was straight. As we have said, an examination of the plat shows that the stairway involved in this case was there described as straight. There were two stairways on the plat, one of which counsel apparently overlooked and which has nothing to do with this case but leads to an upper floor. Plaintiff in error's present counsel also argue as evidence of incompetence on the part of counsel who tried the case, that a competent attorney would have questioned Mrs. Finnegan to find out how Louis Scheckley was dressed when he came over to ask her to call the police. He had testified that he was awakened by the scream of his mother and sprang out of bed, was shot and kicked, and then jumped through the window of his bed-room, next to Mrs. Finnegan's house, and asked her to call the police. The record shows, though it does not so appear in the abstract, that Mrs. Finnegan testified, "Louis Scheckley came to my house, dripping with blood, and asked me to call the police." Counsel argue that an examination of Mrs. Finnegan might, and probably would, have disclosed that when Louis Scheckley came to her house he was dressed in street clothes, which would have tended to show that he was dressed at the time of the shooting and was not called out of bed by a scream, all of which they say would corroborate the evidence of plaintiff in error that he shot in self-defense and that Scheckley was first to shoot. It is no more reasonable to assume that Mrs. Finnegan would have testified that Scheckley was dressed in street clothes when he came to her house than it is to assume that she would have testified that he was dressed in night clothes. If the latter had been her testimony it would have corroborated Scheckley's testimony in a very vital matter. We do not know what she would have testified to as to that matter. There is nothing in the record to indicate that counsel's omitting to so question the witness was more

an evidence of want of competency on his part than it was an evidence of shrewdness.

That the case was argued fully by counsel for Hauke is shown by the transcript of his argument, which covers eighty-six pages of the record. While he stated at the opening of the trial that he had not prepared his case, it is evident from the nature of the facts shown, as well as from his statement as to what witnesses he wanted, that all witnesses who knew or could have known anything in connection with the act were called and testified. As we have stated, the testimony of Hauke agreed with all of the witnesses on both sides except as to what took place in the house at the time of the shooting and the relationship of Scheckley with Hauke's wife, and there is no reason for anyone to suspect that any witnesses to what happened at the house were to be had, other than DiFalco, Mrs. Finnegan, Louis Scheckley and the defendant.

Numerous errors as to instructions are urged. It is contended that the court erred in giving instruction No. 3. It appears that instructions for both State and defense were read together, and we cannot determine whether this instruction was tendered by the State or the defense. It told the jury that before they could find the defendant guilty of the charge of murder, as alleged in the indictment, the State must prove beyond a reasonable doubt (1) that the defendant unlawfully took the life of the deceased; (2) that at the time the deceased was shot she was herself in the peace of the people; and (3) that the shooting was done with malice aforethought. This is a correct proposition of law directly applicable to this case. Counsel for plaintiff in error, however, argue that the instruction did not include involuntary manslaughter or homicide by misadventure, and so invaded the province of the jury and deprived the defendant of the right to have the jury consider his theory of defense. This instruction told the jury what it was necessary for the State to prove and did not

purport to direct a verdict of guilty. Instruction 15 told the jury that where one reasonably believes that he is about to receive great bodily harm, or reasonably believes from all the circumstances as they appear to him that he is about to lose his life, he may slay and kill his adversary under such circumstances and such killing is justifiable, and if one in reasonable defense of his life from great bodily harm or loss of his life at the hands of his adversary slays and kills his adversary, slays and kills an innocent by-stander, the killing of such innocent bystander under such circumstances is excusable under the law. This stated fully and clearly the theory of the defense. It was not error to give instruction No. 3.

It is complained that instruction No. 6 was error; that it did not present a true statement of the law, and that it was designed to take away from the accused the benefit of the presumption of innocence by reason of the language, "It is not intended to aid anyone who is in fact guilty of crime." This is an instruction very frequently used, which told the jury that the rule which clothes every person accused of crime with the presumption of innocence and imposes on the State the burden of establishing his guilt beyond a reasonable doubt is not intended to aid anyone who is in fact guilty of crime but is a humane provision of the law, intended, so far as human agencies can, to prevent an innocent person from being convicted. This instruction has frequently been approved by this court. *People* v. *Rees,* 268 Ill. 585.

Instruction No. 8 is next complained of. This instruction told the jury that the right of self-defense did not imply the right of attack in the first instance or permit an action to be done in retaliation or for revenge. The objection to this instruction is that the evidence was conflicting as to whether the accused was assailed and the instruction assumes that the accused was the assailant. This instruction was based on the evidence offered by the Peo-

ple and represented their theory of the case. It was not error to give it. *People* v. *Andrews,* 327 Ill. 162.

It is also urged that the court erred in failing to give an instruction on manslaughter and to give to the jury a form of verdict for manslaughter. There was no evidence in this record upon which a verdict of manslaughter could be based. Under the facts it was either murder or the unintentional killing of the deceased while the accused was defending himself against the assault of a third person. In such a condition of the record it would be error to give such an instruction. *People* v. *Schultz,* 267 Ill. 147.

Instructions 10, 14 and 15 are objected to on the ground that they omit the element of misadventure or self-defense. These instructions clearly state the rule as to self-defense, and No. 15, as we have seen, states the rule as to killing by misadventure or killing of an innocent bystander. An examination of the instructions shows that they completely cover the law.

It is next urged that the court permitted improper argument on the part of the assistant State's attorney. Counsel point out no statement, however, which is not based on the evidence in the record as shown by an examination of the transcript thereof. They say that the State's attorney argued that to have served in the armed forces of the United States is comparable to being a bum and a vagrant. An examination of the argument made by the State's attorney does not warrant this construction. The State's attorney, in commenting on the statement of one of Hauke's sisters that she did not know his reputation because he had been away, stated, "He has been away; he has been in the army; he has been bumming." This statement is entirely based upon the testimony of Hauke, who testified that he had been in the army; also that he had been in various parts of the world, and that he had been going from place to place in this country after having been discharged from the army. The expression "bumming" is one not infre-

quently used to describe the act of wandering about from one place to another. Certainly counsel could scarcely hope to find in the minds of the jury acceptance of the proposition that service in the army in defense of one's country is comparable to being a bum and a vagrant. His language does not justify such a construction. It is also objected that the prosecutor used vivid, picturesque and unjustifiable descriptive adjectives against Hauke, designed for the sole purpose of inflaming the passion and arousing the prejudice of the jury. The strictures of the State's attorney on the defendant were severe, but they were his characterization of the acts shown by the State's evidence. We are of the opinion that no error was committed in the arguments of counsel.

As we have indicated, the facts of this case are simple. The question narrows itself down to whether plaintiff in error unlawfully and feloniously shot and killed the deceased or acted in self-defense, and in so acting killed the deceased while attempting to defend himself against his assailant. His own statement, together with the undisputed evidence in the record, tend to show that he could not have killed the deceased in the manner described by him. He says that when he fired at Scheckley the deceased was standing on and near the top of the stairs while defendant was at the bottom of the stairs; that when he fired he saw the deceased fall; that he passed by her, following Scheckley into the dining room, and struck him with his fist. Scheckley testifies that when he ran out of his room into the dining room after having been aroused by the screams of his mother, he found her lying on the floor in the hallway between the dining room and the kitchen, her head toward the dining room, her body straightened out toward the kitchen. Officer Starr testified that when he arrived there, a short time after the shooting, he found the deceased lying in the hallway and kitchen, with her head and shoulders toward the door leading to the dining room. This was also

the testimony of officer McDonough. She had·been shot through the head. It is a matter of common knowledge that she could not, with the wounds she received, ascend the stairs and then fall into the position and at the place in which she was found. · It also seems unlikely that if she was ascending the stairs the accused could have shot her twice through the left side of her face as she was in front and above him. The evidence tends to show that one of the bullets went through the head of the deceased and out on the other side at a point nearly opposite that of its entry. It does not seem possible that a bullet would have taken such a course if fired from a point below the deceased. The deceased was about five feet and eight inches in height and weighed 170 pounds. Her son, the only other person present, was wounded, and it does not seem likely that he could or would have dragged her up the stairs and placed her body in the position in which she was found by the officers, or that he would have left her in that way if he could have brought her up the stairs. These facts, therefore, seem to point most strongly to the conclusion that she was not shot on the stairs, as the accused declared, but while she was in the kitchen, and that she was not shot while the accused was defending himself against an assault by Scheckley.

The charge and the penalty imposed in this case are serious. We are unable to see, however, where, if a new trial were had, any different result would be likely to occur. Counsel for plaintiff in error have not pointed out any evidence that might be secured which would be different from that given or more beneficial to the defendant. This is a case where the serious consequences to plaintiff in error have arisen not out of lack of competent counsel or errors occurring on the trial but out of the lack of defense to the charge.

The judgment of the criminal court is affirmed. The clerk of this court is directed to enter an order fixing the

period between sunrise and sunset on Friday, the 11th day of October, 1929, as the time when the original sentence of death entered in the criminal court of Cook county shall be executed. A certified copy of that order will be furnished by the clerk of this court to the sheriff of Cook county. *Judgment affirmed.*