People of the State of Illinois, Appellee, v. Juanita Johnson, Appellant.

Gen. No. 64–12.

Fifth District.

December 8, 1964.

Robert H. Rice, of East St. Louis, for plaintiff in error.

John M. Karns, Jr., State's Attorney, of Belleville (Frank M. Rain and Sylvester Carter, Assistant State's Attorneys, of counsel), for defendant in error.

DOVE, P. J.

Juanita Johnson was indicted by the grand jury of St. Clair County for the alleged murder of Eary

Mae Pratt. Upon a trial of the issues made by the indictment, and her plea of not guilty, the jury returned a verdict finding her guilty of voluntary manslaughter, and her age forty-seven years. After denial of her post-trial motion in arrest of judgment, or in the alternative for a new trial, judgment was rendered on the verdict, and defendant was committed to the state reformatory for women for an indeterminate term of not less than ten years and not more than twenty years, as provided by law. To reverse this judgment defendant appeals.

The sole contention of appellant upon this appeal is that the evidence produced at the trial, if believed by the jury, would have reduced the crime charged in the indictment, to involuntary manslaughter; that an instruction defining involuntary manslaughter, and a form of verdict finding defendant guilty of this crime, were submitted to the court by counsel for defendant with the request that they be given the jury. The State's Attorney objected. The objection was sustained, and the tendered instructions were refused. In view of this contention, it is necessary to review the evidence.

The record discloses that decedent was the regular barmaid employed at a tavern, located in or near Brooklyn, Illinois. The defendant had an invitation to attend a Halloween party at this tavern on the evening of October 31, 1962, and arrived there, alone, about ten o'clock that evening. Upon entering the tavern, she sat down at a table not far from the bar, and during the evening and morning hours following, she freely partook of intoxicating liquor.

Hudis Hunter, a witness called by the State's Attorney, testified that he was employed at the Club as a janitor, and arrived at the Club about 6:20 o'clock on the morning of November 1, 1962; that he observed

defendant seated at a table three or four feet distant from the bar; that Agnes Butler was also at the table, and there was a "fifth of whiskey" on the table; that Eary Mae Pratt was behind the bar; that he heard an argument, and Miss Pratt came to the table where defendant was seated and stood with her hands on her hips; that Miss Pratt did not have anything in her hands; that suddenly the chair upon which defendant was sitting slipped back and defendant ran to the corner of the building, and witness heard two shots; that after the second shot, Miss Pratt rushed toward the same corner, fell on top of defendant, and was unable to get up. On cross-examination, this witness testified that when Miss Pratt came to the table where defendant was seated, she, (Miss Pratt), said: "Here I am. Now either you beat me or I'll beat you. I seen you going in your pocketbook. That don't scare me"; that before defendant ran to a corner of the room, she pushed her chair back from the table; that witness was looking at both parties at the time the shots were fired, but could not state how far apart defendant and Miss Pratt were when the first shot was fired, but the women were one foot apart when the second shot was fired. "I saw," continued this witness, "Mrs. Johnson raise her arm and level the pistol in the direction of Miss Pratt on the second shot."

Frank Skinner also testified on behalf of the prosecution and stated that he was the Chief of Police of Brooklyn, Illinois, and knew the defendant and Miss Pratt; that he had been at the tavern about four o'clock on the morning of November 1, 1962, and stayed about an hour; that he talked to both the defendant and the deceased and they "were in a debate, they were just arguing," and had a fifth of whiskey on the table. He further testified that at about 6:30 o'clock a. m. he received a call, and returned to the tavern to

investigate; that when he arrived there, Miss Pratt was lying on the floor, unconscious with her head propped against a chair, and he found a seven-shot, 22-caliber revolver, with two empty cases and five loaded shells, lying on the floor three feet from the feet of the deceased; that he returned to the police station, and when he arrived at the station about seven o'clock, the defendant was there, and told the witness that deceased had hit her, and that she shot the deceased because she was crippled and couldn't defend herself. This witness further testified that defendant had been drinking a long time, had been drinking too much, and was intoxicated.

The only other witness called by the State was Clifford Kane, the coroner of St. Clair County, who examined the body of Miss Pratt and who testified that one of the bullets penetrated her heart and the other her left lung.

Andrew Hunt was called as a witness by defendant, and he testified that he was at the tavern on the morning of the occurrence, and prior to the shooting he was sitting at a table with the defendant; that Miss Pratt came toward defendant and he moved away "because they were making some talk like they wanted to fight"; that he never saw any gun, was not watching either party at the time of the shots, and when he left both women were on the floor.

Monroe Cook was called as a witness by defendant, and testified that he knew Miss Pratt and the defendant; that he arrived at the tavern on the morning of November 1, 1962, about 1:30 o'clock, and left about five o'clock, and was gone thirty minutes and then returned; that just prior to the shooting he "physically restrained" Miss Pratt from coming around the bar toward defendant, and shortly thereafter he saw the women struggle and defendant was on the floor when he heard two shots.

31

The only other witness was the defendant who testified that she had received a written invitation to attend a Halloween party at this club or tavern; that upon her arrival about ten o'clock of the evening of October 31, 1962, she seated herself at a table and remained there all evening; that she weighed 170 pounds and had a leg and ankle disability and frequently used ankle braces, but didn't have them on this particular evening. She further testified that decedent was taller, younger, and heavier than defendant, and that on the morning of November 1, 1962, she was seated alone at her table with a partially consumed bottle of liquor on the table; that decedent was standing behind the bar and, directing her remarks to defendant, said that she, decedent, "was either going to beat my ass or I'd beat hers"; that defendant made no reply and decedent then came over to the table where the defendant was seated; that deceased had her hands resting on her hips, and she then repeated the same statement she had previously made, and immediately struck the defendant on the left temple and forehead, knocking her to the floor. "I could not see," continued the defendant, "what she struck me with. She did it so quick. I fell out of my chair. I had difficulty moving about due to my physical condition. When Eary Mae knocked me down, I tried to get up. I was having difficulty in getting up and Eary Mae stayed with me. After falling to the floor, I took a gun out of my purse."

Counsel for defendant then inquired of the witness: "Did you at any time intentionally fire the pistol which you had in your hand?" Defendant replied: "No, sir." She then stated that while she was on the floor she recalled hearing two shots fired; that she never pointed the gun at the deceased, but after the last shot, deceased fell and her body landed on the body of the defendant. On cross-examination, af-

32

ter identifying the gun she had on this occasion, she was asked by the State's Attorney: "And you fired it twice, didn't you?" She answered: "I fired it twice, but I didn't—." The State's Attorney interrupted her, stating: "That is all, thank you. You can step down." The witness then said: "I didn't fire it. It went off."

It was the theory of defendant in the trial court, and her counsel insists in this court, that the evidence, if believed by the jury, would have reduced the crime charged to involuntary manslaughter, and the jury should have been so instructed. It is insisted by counsel for the People that involuntary manslaughter is the killing of an individual as the result of an unintentional act committed in a reckless manner; that the trial court, at the request of the defendant, instructed the jury on the law of voluntary manslaughter, and upon the law of self defense, and therefore the trial court did not err in refusing defendant's proffered instructions on involuntary manslaughter.

The Criminal Code of 1961 provides that a person who kills an individual without lawful justification commits murder; that a person who kills an individual without lawful justification, if at the time of the killing he is acting under a sudden and intense passion, resulting from serious provocation by the individual killed, commits voluntary manslaughter; and that a person who kills an individual without lawful justification commits involuntary manslaughter, if his acts, whether lawful or unlawful, which cause the death, are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly. (Ill Rev Stats 1963, c 38, Art 9—Homicide, §§ 9–1, 9–2, 9–3.)

In People v. Tanthorey, 404 Ill 520, 89 NE2d 403, the defendant was convicted of murder. The defendant testified that the deceased was the assailant in a fight and while the defendant was attempting to ward

off blows from the deceased, the gun in the possession of the defendant was discharged, killing the deceased. The defendant testified he did not fire the weapon intentionally. In approving the action of the trial court in refusing manslaughter instructions tendered by defendant, the court said: (p 531) "Furthermore, the defense of misadventure advanced by him (the defendant) in his testimony, cannot be reconciled with the offense of manslaughter anymore than it can be reconciled with the offense of murder. The two are incompatible and cannot emerge from one factual situation. His testimony contains no facts, assuming it to be true, upon which the giving of a manslaughter instruction could be rightfully predicated."

In People v. Hauke, 335 Ill 217, 167 NE 1, the defendant was convicted of murder. The defendant testified that he killed the deceased while acting in self defense against an attack by a third person, and that the death of deceased was accidental. The trial court refused his tendered instructions on involuntary manslaughter and homicide by misadventure. In affirming the judgment, the Supreme Court stated that the law of self defense stated fully and clearly defendant's theory of the case, and that defendant was either guilty of murder or not guilty of any offense.

In People v. DeRosa, 378 Ill 557, 30 NE2d 1, the Supreme Court discussed the distinction between murder and manslaughter, and in the course of its opinion said: (p 562) "Where the evidence in a murder case would permit a jury to reduce the crime to manslaughter, an instruction on manslaughter should be submitted. (People v. Pursley, 302 Ill 62, 134 NE 128; People v. Bacon, 293 Ill 210, 127 NE 386). Conversely, where the evidence clearly demonstrates that the killing was murder, an instruction authorizing manslaughter is erroneous. (People v. Moore, 368 Ill 455, 14 NE2d 494; People v. Payne, 359 Ill 246, 194

34

NE 539; People v. Hauke, 335 Ill 217, 167 NE 1; People v. Brown, 326 Ill 640, 158 NE 403; People v. Grant, 313 Ill 69, 144 NE 813; People v. Schultz, 267 Ill 147, 107 NE 833). According to the testimony adduced by the People, the defendant, Consentino, and Varallo entered a restaurant together, sat down together, and shortly thereafter, without provocation, defendant fired two shots into Consentino's head. Recourse to the evidence introduced by the defendant discloses that he interposed two conflicting defenses, first, misadventure, in that Consentino attempted to kill him; that he seized the gun and during the ensuing scuffle the gun went off with Consentino's finger on the trigger. Secondly, defendant testified that after using profane language, Consentino drew a gun on him, threatened to take his life, and that he, defendant, seized the gun and killed Consentino in order to preserve his own life. In the event of Consentino's death, resulting either from a misadventure such as an accidental firing of the gun or from the defendant's exercise of his inalienable right of self defense, defendant could not have been guilty of manslaughter. There was no basis in the evidence on the part of either the People or the defendant for an instruction on manslaughter. Defendant was either innocent or guilty of murder, and the refusal to give an instruction on, and form of verdict for, manslaughter was correct. People v. Hauke, supra; People v. Schultz, supra."

■ In the instant case, according to the testimony of the defendant, she was the victim of an unprovoked attack, and was at a place where she lawfully had a right to be, and without saying or doing anything to bring about an assault, she was struck by decedent, and as a result thereof, she fell or was knocked from the chair upon which she was sitting, to the floor. While on the floor, she obtained her pis-

tol from her purse and she discharged it. Her testimony, however, is that she neither pointed the weapon at the deceased nor intentionally fired it, but, as she described it, the pistol "went off." She requested and the court instructed the jury as to what constituted voluntary manslaughter, and self defense. Under these instructions the jury acquitted defendant of murder, but found her guilty of voluntary manslaughter. Voluntary manslaughter involves two situations. One, where a person kills another without lawful justification, and where, at the time of the killing, he who did the killing, was acting under a sudden and intense passion, resulting from serious provocation by the one killed, and secondly, where the person intentionally or knowingly kills another, where at the time of the killing he believed the circumstances to be such, that, if they existed, his conduct would be justified under the law of self defense, but his belief and conduct is unreasonable. In both instances of voluntary manslaughter, the act of the person doing the killing is done intentionally or knowingly. Intent to kill is not an element of involuntary manslaughter. Involuntary manslaughter is an offense which happens without the intent to inflict injury and death results from acts performed recklessly. Self-defense presupposes the intentional use of force in defense of one's person. If the shot fired from appellant's revolver, and which resulted in the death of Miss Pratt, was fired in self defense, no conviction of involuntary manslaughter would be justified. (People v. Hunter, 365 Ill 618, 624, 7 NE2d 444). If her death was due to the accidental and unintentional discharge of this weapon, the killing would have been through accident or misadventure. It might be noted that defendant offered no instruction defining or referring to homicide due to accident or misadventure. This defense, even though in conflict with other evidence in

36

the record, cannot be reconciled with the offense of manslaughter, and is inconsistent and incompatible with self defense.

██ It is a well-established rule of common law, incorporated by statute and by judicial adoption into the jurisprudence of Illinois, that the jury may, under an indictment charging murder, return a verdict convicting the accused of any lower degree or grades of homicide included in the charge, provided there is evidence to support the lower grade or degree. (People v. Lewis, 375 Ill 330, 31 NE2d 795).

At the defendant's request, the trial court gave to the jury an instruction defining voluntary manslaughter and a form of verdict in accordance therewith, and it is not contended that the evidence does not sustain the jury's finding that defendant was guilty of this offense. Defendant did have the right to have her version of the occurrence submitted to the jury. She testified and the jury heard her evidence. Her instructions relating to self defense and a definition of voluntary manslaughter were given, and other than the court's refusal to submit to the jury an instruction defining involuntary manslaughter and a form of verdict in accordance therewith, there is no complaint of any of the rulings of the trial court.

██ The trial court held there was no evidence consonant with the crime of involuntary manslaughter as defined by the Criminal Code of 1961, and refused the tendered instructions of the defendant. In so doing, it did not err. The judgment of the Circuit Court of St. Clair County is, therefore, affirmed.

Judgment affirmed.

WRIGHT and REYNOLDS, JJ., concur.